Laramore, Judge,
delivered the opinion of the court:
These are two cases resulting from a long standing dispute between plaintiff and the United States concerning compensation for the transportation of mails by steamship. In both cases plaintiff sues for compensation for the carriage of mail sacks between the United States and foreign ports, *3 in No. 460-56, for the period October 1,1950 to July 31,1954, and in No. 568-57, for the period August 1,1954 to December 31,1956. Also, in No. 568-57, plaintiff claims compensation for the transportation of mails from the post offices to its vessels for the period August 1, 1954 to December 31, 1956.
During the periods involved plaintiff operated a steamship line between New York or New Orleans, on the one hand, and various ports in Central and South America, the Panama Canal Zone, and islands in the Caribbean area, on the other. Some of the vessels operated by plaintiff were registered under the flag of the United States, some under the flag of Honduras, and certain others were of European registry.
The mails transported by plaintiff during the periods in question consisted of letters, prints, parcel post, registered mail and diplomatic dispatches, and were both domestic mails and mails of foreign origin. All of the pieces of mail were in mail sacks. Plaintiff also transported mail sacks containing empty sacks being returned to the country of origin. Most of these empty sacks were sacks which had originally contained mails sent by steamship to the United States or to a foreign country, and which were being returned to the country of origin through the United States postal service; some of them were air mail sacks which had contained mails flown into the United States and which were being returned by steamship. Defendant confesses liability for proper compensation for the carriage of the latter sacks.
Section 1724, 18 U.S.C., as amended by the Act of September 25, 1951 (65 Stat. 336), authorizes the Postmaster General to require the transportation of mail at a compensation authorized by law. The statute appears in a note below.[1]
*4 Section 125.2(b) of the Postal Laws and Regulations (1948) required that plaintiff receive all outgoing mail at the post offices to be transported by truck to plaintiff’s vessels for transportation to foreign ports, and also required plaintiff to deliver to the post offices all incoming mail. The regulations as amended on June 30,1954, relieved plaintiff of the duty of bringing incoming mails from the vessels to the post offices; incoming mails were accepted by the post offices on the piers, effective August 1,1954.
The law, which was the Act of February 14,1929 (45 Stat. 1175), 39 U.S.C. § 654(a), authorized the Postmaster General to fix the rates of compensation for the transportation of the mails by steamship at not more than 80 cents a pound for letters and 8 cents a pound for other articles, including parcel post. Pursuant to this authority, he fixed the rates set out in paragraph (3) (b) of section 120.7 of the same Postal Laws and Kegulations (1948). This paragraph reads:
Definite rates. Unless otherwise specially provided, payment shall be made for the transportation of United States mails and foreign closed transit mails on steamships of both United States registry and foreign registry, and for the transportation to the United States of mails which the United States is obligated to convey, at the rates of 8.8 cents a pound for mails consisting of letters and postcards and 1.1 cents a pound for mails consisting of other articles, including parcel post, for distances up to and including 300 nautical miles; 23.7 cents a pound for mails consisting of letters and postcards and 2.9 cents a pound for mails consisting of other articles, including parcel post, for distances from 300 up to and including 1,500 nautical miles, and 35.5 cents a pound for mails consisting of letters and postcards and 4.7 cents a pound for mails consisting of other articles, including parcel post, for distances exceeding 1,500 nautical miles.
In applying the rates of compensation as fixed by the Postmaster General, there was deducted the weight of the mail sacks from the weight of the sacks with the letters and packages contained therein, and compensation was paid based upon the net weight of the mails. No additional compensation was paid for returning the empty sacks.
*5 The question presented is whether the rates of compensation fixed by the Postmaster General were intended to coyer all the services required in order to transport the letters, postcards, and other articles, including parcel post.
So far as the transportation of the sacks containing the mail is concerned, we think the rate fixed by the Postmaster General for the carriage of the letters and postcards covered the carriage of the sacks which contained them. It would have been impossible to have carried the letters and postcards without putting them in something. In order to carry them, for which the stated rate was to be paid, the steamship company had to carry the sacks. Had there been any intention to pay additional compensation for the carriage of the sacks, the regulations would have said so. The absence of a provision for payment of additional compensation for their carriage would seem to show that none was to be paid.
The provision for payment for the carriage of “other articles, including parcel post,” referred to the contents of the sacks, not to the sacks themselves. The preceding specific clause clearly referred to the contents and presumably the following general clause did so also. This is in accord with the rule of ejusdem generis.
The sacks were valuable and were used over and over. So, both parties knew that in order to carry the letters and postcards the steamship company had to bring the sacks back. It would seem that the rate fixed for carrying the letters and postcards, not only covered carrying the sacks in which they were contained, but also covered bringing back the empty sacks.
As the Commissioner’s findings show, the practice of paying compensation for the carriage of the letters and postcards and the sacks in which they were contained, based on the weight of the letters and postcards alone, was of long standing. For a very long time the course of action of the Post Office Department shows that it intended the compensation fixed for the carriage of the letters and postcards to include the carriage of the things containing the letters and postcards. No additional compensation has ever been paid for the carriage of the sacks or for the return of them.
*6 For a long time the steamship companies did not protest against this. (They say that they did not protest because they did not know the basis used by the Post Office Department in computing their compensation. This is a lame excuse. It would have been simple enough for them to have found out the basis of computation, if it is true that the Post Office Department would not tell them, by weighing the mails themselves.) More recently they have protested. On June 16,1950, prior to the period for which compensation is sought in this suit, plaintiff’s vice president wrote the Postmaster General saying that for a long time they had protested nonpayment of additional compensation for the carriage of the sacks, and it served notice that it would expect additional compensation in the future.
The Acting Assistant Postmaster General replied on July 14, 1950, in which he quoted the regulation fixing the rates and the duty of the steamship companies to carry the mails and then said:
With very few exceptions, to our knowledge, it is the universal practice not to pay for the weight of sacks used in connection with the dispatch of regular or parcel post mails or for the return of empty sacks, either in transit through foreign countries or by steamers. Compensaiton is paid on the net weight of the mail involved. This practice has been followed for a great number of years and is apparently based on the following provisions of the Universal Postal Union Convention, the present one being that of Paris of July 5, 1947: * * *
Pie said further that the matter was under study by a committee of the Universal Postal Union, and he concluded:
We are sympathetic towards your problem and agree it is necessary that some action be taken towards adopting a universally uniform system as regards possible payment for the weight of sacks used in connection with the dispatch of mails as well as for the return of empty equipment. However, until such time as a change in procedure might be adopted by the Universal Postal Union, we regret it will be necessary for you to accept any mails tendered to steamers of the United Fruit Company by the United States postal authorities in accordance with the rules and regulations as set forth by the Postmaster General.
*7 This letter was written prior to the period involved in the present suits. It stated what the long continued practice had been and that this practice would be continued until changed by the Universal Postal Union. That practice was to pay for the carriage of the letters and postcards and other articles and the sacks in which they were contained, and for the return of the empty sacks, on the basis of the weight of the letters and postcards and other articles, exclusive of the sacks.
In short, plaintiff’s protest was rejected, and it was stated that the ancient practice would be continued.
This, of course, was equivalent to saying that the rates fixed covered the carriage of the sacks, both ways, as well as the articles which they contained. Since the Postmaster General had the authority to fix the rates, this would seem to conclude the matter.
As the findings show, the Postal Union Convention held subsequent to the date of the letter of the Assistant Postmaster General, to wit, the Brussels Convention of 1952, refused to change the basis for the payment of compensation, and continued to compute it on the net weight of the contents of the sacks.
This leaves the claim for compensation for picking up the mail at the post offices and taking it to the steamships. It will be recalled that sectiton 1724 of Title 18 U.S.C. as amended, authorized the Postmaster General to “require the transportation by any steamships of mail between the United States and any foreign port at the compensation fixed under authority of law.” As stated above, section 125.2(b), as amended, required the steamship companies to come to the post office to pick up the outgoing mail. The rates fixed by the Postmaster General were intended by him to cover compensation for this service, as well as the transportation by sea.
As we said above, in discussing the claim for additional compensation for the carriage of the sacks, if it had been intended to pay additional compensation for their transportation, the regulations fixing rates would have said so. The failure to provide for additional compensation indicates that the rates fixed for the carriage of the letters, etc., in- *8 eluded all services incidental thereto, and that embraced the duty, in the opinion of the Postmaster General, of coming to the post office to get the outgoing mail.
For many years prior to 1954, steamship companies had been required to pick up outgoing mail at the post office and to deliver incoming mail to the post office. As far back as 1889 the Assistant Attorney General in charge of post office matters rendered an opinion in which he said:
It has before been stated that the transfer of all mails between steamships and post office at New York and elsewhere is made by the steamship companies and at their expense, and the compensation to such steamships is supposed to cover the cost of this service; in other words, that the compensation is for the transfer at ports of arrival and departure as well as for the conveyance by sea. There is therefore an implied contract between the United States and every vessel carrying mails to and from the United States and foreign ports that the latter will pay all the expense of moving said mails out of and into the post office; and this implied contract has assumed the force of positive written agreement, sustained by an unbroken line of precedents running through many years. * * * [2 Op. Assist. Att. Gen. for Post Office Dept., p. 765.]
Since the Postmaster General in fixing the rates of compensation, acted within his authority, and since it seems that the rates fixed were intended to cover the transportation of mail to and from the post offices, until 1954, and thereafter to cover transportation of outgoing mail from the post offices to the pier, we are of opinion plaintiff is not entitled to recover therefor.
What we have said above, however, does not apply to empty sacks brought back to the place of origin by plaintiff’s steamships, but which had been used in the transportation of letters, etc., by airplane. There was no duty on plaintiff as a carrier of the mails to return these sacks to the place of origin, and when plaintiff was requested to do so and it did so, it was entitled to compensation therefor.
So far as the basis for plaintiff’s compensation is concerned, in returning the sacks it was not acting as a carrier of the mails, since it had not used them to carry the letters, etc., from the point of origin. It was acting only as a carrier *9 of cargo. Its relationship to the sacks was no different from its relationship to any other cargo. But, so far as our jurisdiction is concerned, these empty sacks were an adjunct of the United States mails and, as such, were exempt from a libel in rem in the courts of admiralty. As we stated in our former opinion in this case, 144 Ct. Cl. 154, we do not think the Suits in Admiralty Act (41 Stat. 525) was intended to apply to a suit involving the carriage of the mails; nor do we think it applies to the carriage of something so intimately connected with the carriage of the mails as a mail sack.
Defendant admits plaintiff is entitled to compensation for the carriage of these sacks, but it does not state to us how it thinks it ought to be computed. Since plaintiff had a published tariff for the carriage of empty mail sacks, it would appear it is entitled to be compensated on the basis of this tariff.
Plaintiff is entitled to recover for the last mentioned item, and judgment will be entered to that effect. The amount of recovery will be determined pursuant to Buie 38 (c).
It is so ordered.
Need, Justice (Bet.), sitting by designation; Dtjkfee, Judge; Madden, Judge; and Jones, GMef Judge, concur.
ENDINGS OP PACT
The court, having considered the evidence, the report of Trial Commissioner William E. Day, and the briefs and argument of counsel, makes findings of fact as follows:
1. At all times material herein plaintiff was, and is, a corporation organized and existing under the laws of the State of New Jersey.
2. Prior to October 1, 1950, and continuously thereafter, plaintiff operated a steamship line between New York and New Orleans, on the one hand, and various ports in Central and South America, the Panama Canal Zone, and islands in the Caribbean area, on the other. Plaintiff operated approximately four sailings a week out of both New York and New Orleans.
3. Certain of the vessels operated by plaintiff were registered under the flag of the United States and were operated *10 under demise charters from wholly-owned subsidiary companies ; certain other vessels were of Honduran registry and were operated under time charters from wholly-owned subsidiaries; other vessels were registered under the flags of various foreign countries and were time chartered from subsidiary or unrelated companies. Vessels operated under demise charters were manned by plaintiff’s employees; crews for the vessels operated under time charters were furnished by the vessel owners. Plaintiff exercised control over the operation of the vessels, whether under demise or time charter, fixed sailing dates and itineraries, provided pier space, and advertised to the general public for cargo and passengers.
4. In its regular operations, plaintiff receives cargo delivered at the pier at the shippers’ expense. The cargo is not weighed by plaintiff; the shippers are required by law to give the correct weight and the shippers’ declaration of weight is accepted by plaintiff. General cargo moves under bills of lading and, in the case of Government cargo, on Government form bills of lading. The rates for such cargo are fixed either by plaintiff or, in trades where plaintiff is a member of a shipping conference, by the conference, and are on a weight or measurement basis, whichever produces the greater revenue. As is customary in freight tariffs, plaintiff’s cargo rates are applied to the gross weight of the freight, including any packaging.
5. At all times involved in these actions, the transportation of mails by ship from United States ports to foreign ports was required by law to be performed at rates fixed by the Postmaster General of the United States.
6. Prior to and during the period October 1, 1950, to August 28, 1952, Section 125.2(b) of the Postal Laws and Regulations, 1948, provided that mails for dispatch by outgoing steamers shall be delivered from the post office and that steamship companies shall haul the sacks to the steamers. This regulation was amended on August 28, 1952 (redesig-nated Section 125.4 (b)) to provide that steamship companies shall be responsible for the transportation and the protection of all incoming and outgoing mails, including parcel post and sacks containing empty equipment (sacks), between the post office and the transporting vessel. The regulations re *11 quire tliat a man ride on the rear of trucks (or wagons) and protect tke mail, and that registered (red label) sacks shall be separately delivered to the steamship company’s representative at the post office and specially protected during transfers and on board vessels. The order of August 28, 1952, was amended June 30,1954, so as to relieve the steamship companies of trucking incoming mails from ship to the post office; incoming mails were accepted by the post office on the pier effective on and after August 1, 1954. This amendment was effectuated on August 1, 1954 by the Post Office Department performing the trucking service on incoming mail from pier to the post office.
7. In case No. 460-56, plaintiff seeks to recover (1) compensation for the weight of sacks enclosing mails, and (2) compensation for bundles of empty sacks for the period October 1,1950, to July 31,1954, and in case No. 568-57 for the period August 1,1954 to December 31,1958. In case No. 568-57, plaintiff also seeks reimbursement for the cost of trucking outgoing mails from the post offices to its vessels. The plaintiff has been paid on the basis of the weight of the mail matter enclosed within the sack. It seeks additional compensation based on the weight including the sacks and for the transportation of the empty sacks.
8. Mails transported by plaintiff were domestic mails originating in the United States and mails of foreign origin sent to United States post offices at New York, New Orleans and the Canal Zone for further dispatch to third countries. Such mails of foreign origin are designated as “foreign closed transit mails” or “transit mails” and those post offices at ports receiving and transmitting such mails are designated as “exchange offices”. Both domestic and foreign closed transit mails, enclosed in canvas sacks or bags consisted of (1) letters, (2) printed matter (prints), (3) parcel post, (4) registered sacks of letters, prints and parcel post, and (5) diplomatic dispatches, classified as prints. Also transported were sacks enclosing empty sacks being returned by the first steamer available to the country of origin. The empty mail sacks were (1) sacks which had originally enclosed mails sent by steamship to the United States or another foreign country and which were being returned to the country of *12 origin through, the United States postal service, and (2) air mail sacks which had enclosed mails flown into the United States and which were being returned by steamship.
9. Prior to and after October 1, 1950, plaintiff transported domestic and transit mails tendered by the Postmasters at New York and New Orleans at the post office platforms for delivery to ports in Central and South America, the Panama Canal Zone, and islands in the Caribbean area. In addition, prior to and subsequent to October 1, 1950, letter and print mails of countries signatory to the Convention of the Postal Union of the Americas and Spain, were tendered at the Canal Zone and other ports for transportation on plaintiff’s American flag vessels.
10. Plaintiff’s sailing schedules for all of its services were sent to shippers, freight forwarders and other interested persons, and were publicly advertised in the New York Journal of Gommerce and other shipping publications. Sailing schedules included United States and foreign flag vessels operated by plaintiff. The New York Post Office published a daily bulletin, for the information of its employees and patrons, which listed in advance the sailing time and pier of vessels of United States and foreign registry selected for the dispatch of mails to foreign countries, and the closing time for the mails at the post office.
11. The “Manual of Information for Exchange Offices”, which contained instructions from the Post Office Department to the post office employees of United States exchange offices, contains the following:
*****
Duty' of vessels to carry mail tendered: — Except as otherwise provided by treaty or convention, the Postmaster General may require the transportation by any steamships of mail between the United States and any port in another country at the compensation fixed under authority of law.
Arrangements with steamship companies: — It is the function of the exchange offices at ports in the United States and possessions to arrange with the steamship companies for the conveyance of mails and parcel post to other countries or other overseas destinations by vessels sailing from those ports whose schedule and itinerary meet with the regulations, instructions and requirements issued by the Department.
*13 Action should therefore be taken at such exchange offices to obtain information regarding prospective sailings of all vessels by which the mails or parcel post made up by such exchange offices or received from other exchange offices may be dispatched.
The information is obtained by communicating with the steamship companies by telephone or otherwise or through advertisements of the steamship companies or other notices carried in the daily press or other periodicals that may be obtained.
When a steamer is found to be available for the conveyance of mail or parcel post, Form 2906, titled “Steamship Notice — Ocean Mail Service” is mailed to the office of the steamship company or duly authorized agent. The form is self-explanatory and when filled out and returned by the steamship company or agent, furnishes, in addition to the name and registry of the steamer, information to accurately determine (barring later changes) the departure date, ports of call, arrival dates and mails to be conveyed. Changes in the time or date of departure, or ports of call received by telephone should be entered on the Form 2906 to show date and time the information was received and name of steamship official giving the information.
Delivery Time: — Mails are delivered to the representative of the steamship company at the post office. The delivery time or the time the final sack will be delivered to the steamship representative will depend upon the distance from the post office to the steamship pier and should be as close as practicable to the sailing time of the steamer, to allow for the latest possible closing time of mails at the post office.
$ $ $ $ $
12. During the week preceding the advertised sailing of each of plaintiff’s vessels, the postmasters at the exchange offices addressed to plaintiff a printed Form 2906, entitled “Steamship Notice — Ocean Mail Service”, for each of plaintiff’s advertised vessels and requested for the vessel named in the form by the postmaster, the flag of registry, the date and time of sailing, the pier, the ports of call and the expected dates of arrival. Prior to December 1954, Form 2906 contained the following statement:
In connection with the dispatch of mails, it is requested that you fill in the blank below for next week, and mail as soon as possible, but no later than Wednesday of this week, in enclosed envelope. It is important *14 that every' fort of call on the outward trif should he given in the order in which they will he made with the effected date of arrival at each fort. In the event of no departure, or the sailing being postponed, you will please note the same hereon, and retwrn to this office.
If from any cause it shall be found necessary to postpone or advance the departure of the steamship, immediate notice of the fact should be sent to this office, in order that advertisements and bulletins may be altered accordingly. It frequently occurs that advice of such changes is not received until too late to be of service, and then only from unauthentic sources.
Mails for dispatch by outgoing steamships shall be delivered at the post office, at the time agreed upon, to the respective steamship companies, who must convey them to their steamships.
(After the signature of the postmaster, blank spaces were provided at this point for inserting, after the name of the vessel, the information requested.)
It is understood that the mails shall be carried in accordance with the terms, conditions, and responsibilities prescribed by the Postal Laws and Regulations of the United States and postal conventions now in effect.
Each truck (or wagon) conveying mail from the post office to the steamship will be provided with a man to ride on the rear so as to prevent interference with the mail or the possibility of a sack working loose and falling, unobserved, into the street.
After filling the blanks with the requested information for each vessel, plaintiff signed and returned the form to the postmaster.
The last two paragraphs of Form 2906 were changed in December 1954 to read as follows:
It is understood that the mails shall be carried in accordance with the terms, conditions and responsibilities prescribed by the Laws governing the operation of the Postal Service, title 39 of the Code of Federal Regulations, and postal conventions now in effect.
Each vehicle used to transport mails between post offices and vessels, except the completely closed van type, the mail compartment of which must be locked or sealed, shall be provided with a man to ride on the rear and protect the mail. When a rack type truck is used the sacks shall be covered by a tarpaulin.
13. To carry the mails from the post offices to the piers at New York and New Orleans, plaintiff entered into con *15 tracts with trucking companies under which plaintiff paid for the trucking at a minimum rate per bag on week days and at a higher rate per bag for overtime periods, weekends and holidays. The names of the truckmen authorized to receive the mails were furnished to the post offices.
14. The mails for dispatch on a particular steamer were tendered the trucking contractor at the post office platform by post office employees who gave to the truckman a preliminary count of the number of sacks loaded with no indication of whether the sacks contained letters, prints or empty sacks. With the last truckload, the post office furnished Form 2988A, entitled “Waybill of Sacks Dispatched”, and Form 2988B entitled “Waybill of Diplomatic Dispatch Pouches”. Form 2988A listed registered sacks according to country of origin and port of destination; however, only the count of sacks of (1) letters and prints, (2) parcel post, and (3) motion picture films, was shown, without reference to origin. Diplomatic pouches were listed according to origin and destination. A revision of Form 2988A in September 1953 provided space for listing as part of the “mail” advised on the waybill the number of sacks containing empty mail sacks.
15. As required by regulations, the mails were given special care for their protection while being trucked to the pier. They were the last item placed on board the vessel on departing and first off on arrival. On board the vessel, as a security measure, the mails were placed in locked compartments, containers or enclosures.
16. In connection with the weighing of the mails prior to dispatch, the Manual of Information for Exchange Offices stated as follows with regard to letter and print mails:
Bagging, Sealing, Weighing and Recording * * ❖ * *
Payment for the conveyance of mails by steamers to other countries is based on the net weight of the mails (rate for letters is more than that for prints). Therefore, in weighing the sacks, the net weight is recorded.
*16 With regard to registered mails, the Manual stated:
¡Jí '1'
In closing out a dispatch or when a sack is made up at any other time, the articles to be enclosed are weighed before being placed in the sack and the net weight (letters and prints separately) is recorded.
# & * #
With regard to parcel post mails, the Manual stated:
* * * * *
Bulk hilled -parcels: — Ordinary parcel post packages which are to be advised simply in bulk on the parcel post bill (Form 2974) are placed directly in a sack after separation to the proper exchange office in the country of destination. As each sack is made up, it is entered on the bagging sheet separately, showing the sack number in consecutive order (commencing with No. 1 for each dispatch), the number of parcels of each weight unit in the sack (if required by the country of destination), and the net weight of the parcels.
Large Yol-wme:—
# $ # # #
In following this method the parcels for each exchange office are separated by weight unit groups and each group is bagged separately so that all the parcels in a sack will be of the same weight unit group, and it is to be understood that only sacks containing parcels of one weight unit group are to be entered on a single line as the records must show the weight unit of the parcels contained in any sack in case of future inquiry.
:f: & # #
With regard to foreign closed transit mails, the Manual stated:
*****
~Weights: — A record is made of the origin and destination of each foreign closed transit mail dispatched by each steamer, registered and ordinary mails separately. The net weights of the sacks as endorsed on the labels are recorded by countries of origin and destination according to three classifications, letters, prints and parcel post. The weights are totaled according to the requirements of the reports submitted on Forms 296B, 2963(c) and 2963(d).
*17 In connection with the preparation of weekly weight reports, the Manual stated:
$ $ $ ‡ $
Reports of the Weight of Mails Dispatched by Steamer, Forms 2963, 2963(c), 2963(d)
Net weights: — The net weight of the mails is the basis upon which payment is made for the transportation of mails on steamships of both United States and foreign registry.
* ❖ * * *
With regard to the return of empty sacks, the Manual stated: * * * * %
Bundles enclosed in sacks of 'prints: — Bundles of empty sacks not numerous enough to form a full sack are tied out with green labels and inserted in a sack of prints for the exchange office to which the sacks are being returned. The weight of the enclosed empty sacks is not included in the net weight of the outside sack.
* * * * *
Weights:- — The weights of sacks of empty equipment are not ascertained nor recorded as no compensation is paid for transportation of such sacks by steamships.
17. Prior to their dispatch, the mails are weighed in a post office workroom from which the general public is excluded. Letter mails were enclosed in sacks and weighed on scales which were preset for the tare weights of sacks used, and the indicated net weight of the mails enclosed was recorded for compensation purposes. Print mails are similarly weighed on a platform scale, a deduction being made for the weight of the enclosing sack, and the net weights thereof recorded. The sacks of parcel post mail were not weighed. Before being placed in sacks, the parcels were grouped according to the weights as recorded for postage purposes. However, these actual weights were not the weights recorded on forms sent to the steamship companies; instead, the post office recorded an estimated average weight of the parcels, before being placed in sacks. With respect to the foreign closed transit mails, only the net weights of the letters, prints and parcel post mails were recorded. The sacks enclosing empty mail sacks transported by plaintiff were bundled in the same workroom as other domestic mails *18 and were not weighed nor was any record of their weight maintained by the post offices.
18. Approximately a week or ten days after sailing the Post Office Department furnished plaintiff with a statement on Form 2963 of the weights of mails dispatched showing the weights of letters, prints and parcel post of United States origin and, separately, the weights of letters, prints and parcel post of foreign closed transit mails according to port of destination. The weight statements did not indicate whether the weights shown were net or gross weights. The weight statements did not show the number of bags and the weights shown could not be identified with the sacks as listed on the post office waybills.
19. Plaintiff company and the Post Office Department have had a long standing controversy concerning the computation of mail pay for the carriage of ocean mail as relates to three of the elements of the total transportation. These elements or issues are measuring and computing payment on the basis of net as against gross weight; the return of empty sacks,; and, cartage between the Post Office and the steamship dock.
On June 16, 1950, the plaintiff by its vice president sent a letter to the Assistant Postmaster General, which reads as follows:
Over a long period of time this Company has repeatedly protested, verbally and in writing, against the refusal of the Department to allow any compensation for the weight of empty sacks tendered for transportation on ships operated by this Company under the American flag from ports in the United States to foreign ports.
We have also protested the refusal to include the weights of mail sacks in the weights of mails tendered by the United States for transportation to foreign countries.
It is our view that the gross weights of all mails (including sack containers) and empty sacks tendered by U.S. postmasters for outbound transportation is an obligation of your administration and compensation should be allowed and paid at the applicable rates for mail matter of the respective classifications.
The exclusion of the weights of sacks containing mail has no counterpart in any other system of transportation *19 utilized by the Post Office Department. Furthermore, there is no precedent in commercial practice for exclusion of weights of containers. The practice of the Department has now become more aggravated by present requirements that air mail sacks, i.e., sacks carried outbound by air, be returned empty to the United States by steamer.
The Company has long regarded refusal to pay compensation for transportation of mail sacks as being unjust and regrets that it is forced to serve notice that on and after October 1, 1950, any mails that may be tendered the United Fruit Company by the United States postal authorities for transportation on United States registry vessels operated by this Company will be accepted and transported by this Company on the condition that the compensation for the transportation of the mails tendered will be computed upon the gross weight (including sacks) of the mails so tendered and transported.
Any empty mail sacks that may be tendered the United Fruit Company by the United States postal authorities for transportation on United States registry vessels operated by this Company will be accepted and transported with the distinct understanding that compensation will be claimed and demanded at the rates specified in the Postal Laws and Regulations for all other articles.
The foregoing will apply to all so-called Convention mails, for which your administration is obligated to transport under the free transit provisions of the Convention of the Americas and Spain.
We wish to assure the Department of our sincere desire to continue to transport all mails tendered and in no sense is the letter to be construed as a refusal to transport any and all mails at the rates fixed by the *' Postmaster General, and the United Fruit Company recognizes in this regard its obligation under the Postal •Laws and Regulations, but it respectfully disavows any obligation to transport sacks containing mail or empty sacks without compensation.
20. On July 14, 1950, the Acting Assistant Postmaster General, Bureau of Transportation, wrote plaintiff in part as follows:
In this connection your attention is called to the following Sections of the 1948 Postal Laws and Regulations :
*20 Section 120.7, paragraph. 3(b). Definite rates. Unless otherwise specially provided, payment shall be made for the transportation of United States mails and foreign closed transit mails on steamships of both. United States registry and foreign registry, and for the transportation to the United States of mails which the United States is obligated to convey, at the rates of 8.8 cents a pound for mails consisting of letters and postcards and 1.1 cents a pound for mails consisting of other articles, including parcel post, for distances up to and including 300 nautical miles; 23.7 cents a pound for mails consisting of letters and postcards and 2.9 cents a pound for mails consisting of other articles, including parcel post, for distances from 300 up to and including 1,500 nautical miles, and 35.5 cents a pound for mails consisting of letters and postcards and 4.7 cents a pound for mails consisting of other articles, including parcel post, for distances exceeding 1,500 nautical miles.
Section 125.3. Duty of vessels to carry mail tendered. Except as otherwise provided by treaty or convention the Postmaster General may require the transportation by any steamships of mail between the United States and any foreign port at the compensation fixed u/rider aur thority of law. Upon refusal by the master or the commander of such steamship or vessel to accept the mail, when tendered by the Postmaster General or his representative, the collector or other officer of the port empowered to grant clearance, on notice of the refusal aforesaid, shall withhold clearance until the collector or other officer of the port is informed by the Postmaster General or his representative that the master or commander of the steamship or vessel has accepted the mail or that conveyance by his steamship or vessel is no longer required by the Postmaster General. (62 Stat. 784; 18 U.S.C. 1724.) (Italics supplied by the writer.)
The Postmaster General has the lawful authority to set the rates of compensation for the transportation of United States mails on steamers sailing to foreign destinations.
With very few exceptions, to our knowledge, it is the universal practice not to pay for the weight of sacks used in connection with the dispatch of regular or parcel post mails or for the return of empty sacks, either in transit through foreign countries or by steamers. Compensation is paid on the net weight of the mail involved. This practice has been followed for a great number of years and is apparently based on the following provisions of the Universal Postal Union Convention, the present one being that of Paris of July 5,1947:
*21 Article 153, paragraph. 7. In regard to sacks which, contain nothing but empty sacks, or correspondence exempt from all transit charges (Article 68 of the Convention), the note Statistique is followed by the word Exempt.
Article 161, paragraph 5. Transit charge accoimt. In order to tahe accoimt of the weight of the sacies and ;packing, as well as of the classes of correspondence exempt from all transit charges in accordance with the provisions of Article 68 of the Convention, the total amount of the account for closed mails is reduced by 10 percent. (Italics supplied by the writer.)
It will be noted from the quoted Sections of the Universal Postal Union Convention that the weights of empty sacks are not taken into consideration as regards statistics and transit charge accounts. This necessitates our charging other postal administrations for the net weights of any foreign closed transit mails handled by the United States and vice versa.
A meeting of the Technical Transit Committee of the Universal Postal Union was held in Interlaken, Switzerland, during June of 1949, for the purpose of revising the Convention and regulations covering the handling and charges involved in connection with foreign closed transit mails. At that meeting the weight of sacks, as well as the return of empty sacks, was an important item on the agenda.
Owing to the complexities of the overall problem and the different viewpoints of various administrations, final decision was not arrived at during the Interlaken meeting. However, the matter has been and is receiving the attention of the various postal administrations and another meeting of the Technical Transit Committee is scheduled to take place in Switzerland during May or June of 1951, at which time the Committee will make definite recommendations for consideration at the next Congress of the Universal Postal Union to be held in Brussels, Belgium, in 1952.
We are sympathetic towards your problem and agree it is necessary that some action be taken towards adopting a universally uniform system as regards possible payment for the weight of sacks used in connection with the dispatch of mails as well as for the return of empty equipment. However, until such time as a change in procedure might be adopted by the Universal Postal Union, we regret it will be necessary for you t.o accept any mails tendered to steamers of the United Fruit Company by the United States postal authorities in accordance with *22 the rules and regulations as set forth by the Postmaster General.
The emphasis by italic in § 125.3 and Article 161 appears in the Department’s letter by underscoring.
The Post Office has always paid for all elements of ocean mail transportation on a basis computed on a net rather than a gross weight.
21. The plaintiff sent a further letter to the Assistant Postmaster General on September 29, 1950 in which it persisted in its earlier position and requested that it be furnished with information as to the weight of sacks carried, as follows:
* * * *
Neither the weights of sacks containing mails nor the weights of empty sacks, are furnished by postmasters. Therefore, it is respectfully requested that the postmasters tendering mails to our vessels be directed to furnish statements of weights of sacks at the time net weight statements of mails are furnished. It is requested that the postmasters report (a) weights of sacks containing letter mails; (b) weights of sacks containing all other mails; (c) weights of sacks containing parcel post; and (d) weights of empty sacks.
22. On and after October 1, 1950, the Post Office Department continued to tender mails to plaintiff, and the United States postal authorities in the Canal Zone and postal administrations in the Caribbean area began to furnish plaintiff with the gross weights of mails dispatched on plaintiff’s vessels. Plaintiff filed public vouchers with the Post Office Department for compensation on the basis of the gross weights furnished. These claims were disallowed and the Post Office Department revised the vouchers and made payment on the basis of the net weights of the mails transported.
23. On November 14, 1950, the Director of Posts, Balboa Heights, Canal Zone, wrote plaintiff in part as follows:
The question of furnishing the weight of equipment containing mail was referred to Mr. John M. Deciding, Assistant Postmaster General to whom you refer in your letter, and I am enclosing a copy of his reply.
In view of his statement that no instructions have been issued to exchange offices dispatching mails to furnish such weights and that the matter is under study, it will be necessary for us to discontinue showing the weights of *23 equipment on our waybills, as stated in my reply to you under date of October 31, 1950, until such time as a change in policy is made by the Post Office Department in Washington.
The letter of Assistant Postmaster General Bedding to the Director of Posts, dated November 9, 1950, reads in part as follows:
I have not talked to anyone from the United Fruit Company about this subject as alleged in the letter to you and no instructions to furnish such weights have been issued by my office to the exchange offices dispatching the mails.
The matter of pay for the transportation of the equipment[1] is being considered and if decision is reached making a change in our present policy you will be informed accordingly.
24. On May 14, 1951, the Assistant Postmaster General, Bureau of Transportation, wrote to plaintiff’s Washington attorney as follows:
I refer to your letter of October 3, 1950, and your visit here on Friday, May 11, 1951, relative to compensation for transportation of mail sacks tendered by postmasters of the United States for carriage on American flag steamers.
The matter of handling and possible payment for empty mail sacks is on the agenda for discussion at the Technical Transit Committee of the Universal Postal Union to be held in Pontresina, Switzerland next month. Upon the return of our delegation from this meeting, I feel certain that we will be in a position to give you some definite advice on the subject.
25. The territorial and maritime transit rates in the 1947 Paris Convention (Article 67) were the basis of charges on the gross weights of letters and post cards and other articles (not including parcel post) exchanged in closed mails between two postal administrations for the benefit of the country whose services participate in the conveyance by means of the services of one or more other postal administrations.
A Technical Transit Committee was set up by the Universal Postal Union in 1939 to study and report on Universal Postal Union rates. Lapsing during the war, the Technical *24 Transit Committee began meeting in 1949 and from 1950 on. The Technical Committee’s findings on rates were submitted to the Brussels Congress in 1952. The proposal that there should be one rate for all mail was adopted; but, the proposals that gross weight replace net weight as the basis of compensation for carriage and the empty sacks be counted as mail were rejected by the member nations. The Brussels Convention became effective on July 1,1953.
26. The Postal Begulations were amended effective August 1, 1954, removing the requirement that steamship companies truck incoming mails from the vessel to the post office, but leaving intact the requirement that outgoing mails be trucked from post office to pier; and establishing new rates of payment for the transportation of United States mails and foreign closed mails on steamships of United States and foreign registry.
On July 23, 1954, the plaintiff by its vice-president had sent a letter to the Assistant Postmaster General reiterating its previous protest of June 16,1950, and, in addition, served notice that on and after August 1, 1954, plaintiff would demand reimbursement for expenses in trucking the mails from the post offices to the piers.
27. By a letter dated July 16, 1954, from the American Merchant Marine Institute to the Assistant Postmaster General that group confirmed:
We further understand that we are still free to discuss with you amendments to the regulations which would effectuate our contention that compensation to the carriers should be calculated on gross weight of the mails, incoming sacks containing empty sacks, and that reimbursement should be made to ocean carriers for the cost of trucking outbound mails from Post Office to ship side.
In closing, we strongly recommend and request that these new rates, with exceptions aforementioned, be made effective July 1,1954.
To this letter the Assistant Postmaster General replied on June 30,1954:
Your statements of understanding have been noted and I believe it advisable to state the Post Office Department’s position with respect to the applicability of the *25 new rates on some of these points, all of which were discussed in conferences with your representatives prior to the adoption of the proposed rates. The new rates will be applicable on the net weights of the mails, and cover compensation to the carriers for the return of sacks containing empty equipment as well as the transportation of outgoing mails from the post offices to the piers. I am sure we are in agreement as to the understanding of the industry with respect to these three points but your confirmation would be appreciated.
This position of the Post Office was furnished to plaintiff which by a letter signed by Vice President Sam Baggett, dated July 2B, 1954, to the defendant stated:
In connection with these amendments, we have been furnished with a copy of a letter dated June 30, 1954, addressed by you to Mr. Francis T. Greene, Executive Vice President, American Merchant Marine Institute (this Company being a member of the Institute) which contains the following paragraph:
* * * The new rates will be applicable on the net weights of the mails, and cover compensation to the carriers for the return of sacks containing empty equipment as well as the transportation of outgoing mails from the post offices to the piers. I am sure we are in agreement as to the understanding of the industry with respect to these three points but your confirmation would be appreciated.
The application of the new rates to the “net weights” of the mails will result in a substantial reduction in mail compensation to this Company, and on the basis of data submitted by representatives of this Company to representatives of the Department in conferences in recent months, the composite rates are not fair and reasonable. ‡ ‡ $
Accordingly, you are hereby advised that on and after August 1,1954, any mails that may be tendered pursuant to the Postal Laws and Regulations to the United Fruit Company for transportation on U.S. registered vessels operated by this Company will be accepted and transported on condition that compensation calculated on the basis of such rates will be accepted by the Company as compensation in part, and not as full compensation, for services rendered, and that therefore this Company reserves its right to demand payment of full compensation for such services.
*26 The Company recognizes its obligation under the law to transport the mails, and we assure the.officials of the Department of our sincere desire to continue to handle and transport all mails tendered, and in no sense is this letter to be construed as a refusal to provide and perform such services according to law, and in the manner, under the conditions, and with the services as prescribed by the Postmaster General.
28. The Department’s practice of paying for the transportation of the mails on net weights is a long existing one, and apparently arose under E.S. § 4009 which provided that for transporting the mail between the United States and any foreign port the Postmaster General may allow as compensation, if by a United States steamship, any sum not exceeding the sea and United States inland postage; and if by a foreign steamship, any sum not exceeding the sea postage, on the mails so transported. This section, printed as § 1405, Postal Laws and Eegulations, 1924, was followed by a note reading as follows:
Note. In view of the provisions of the Universal Postal Union Convention the term “sea postage” has no meaning. United States steamships receive not exceeding the whole of the postage collected on the articles contained in the mails conveyed by said vessels; and foreign vessels are paid any sum not exceeding the rate of postage fixed for a single maritime transit by the Universal Postal Union Convention in force at such time.
The Act of July 3,1926, entitled “An Act to Amend Section 4009 of the Eevised Statutes,” provided that for transportation of the mails the Postmaster General may allow a vessel of the United States compensation not in excess of the amount of postage collected on the mail transported on such vessel, and in case of a foreign vessel compensation not in excess of the sea transit rates prescribed by the Universal Postal Union Convention. The Act of February 14, 1929, entitled “An Act to prescribe more definitely the rates for compensation payable to steamships of United States registry for transportation of foreign mails,” amended the Act of July 3,1926, so as to provide that the Postmaster General may allow to United States vessels compensation on a weight basis of not exceeding 80 cents a pound for letters and 8 cents a pound for other articles, including parcel post. 39 U.S.C. § 654(a).
*27 29. The rates paid by the Department to the railroads for the territorial transit of the mails are fixed by the Interstate Commerce Commission and provide for compensation on a space, rather than weight, basis including the space occupied by sacks enclosing other mail matter and space occupied by empty mail sacks. Similarly, the Department compensates the airlines for the total weight of the mails carried, making no deduction for the weight of the bags containing mail.
30. On January 20, 1956, plaintiff submitted to the Post Office Department public vouchers for compensation for the transportation of sacks enclosing the mails and empty mail sacks during the period October 1, 1950 through July 31, 1954. By letter dated October 12, 1956, the vouchers were returned unpaid by the Post Office Department.
31. On October 31, 1957, and March 6 and March 24, 1959, plaintiff submitted to the Post Office Department public vouchers (1) for compensation for the ocean transportation of sacks enclosing the mails and of empty mail sacks and (2) for reimbursement for trucking the mails from the post offices to the piers, during the period August 1,1954, through December 31, 1958. The claim for reimbursement for the cost of trucking was based on the cost to plaintiff per bag under its cartage contracts, plus administrative expense of three percent. By letters dated January 6, 1958, and March 13 and 25,1959, the Post Office Department denied plaintiff’s claims.
32. No compensation was allowed or paid based on the weight of the mail including the sacks enclosing the letters, etc., or for the weights of empty mail sacks. The parties have stipulated the weights of sacks enclosing the mails and the weights of empty sacks transported by plaintiff and the amounts due in the event it is found that plaintiff should recover, either completely or in part. The amount due for weights of sacks enclosing the mails is calculated at rates fixed and paid by the Postmaster General for the weight of the mails enclosed in such sacks. The amount due for the empty sacks transported during the period October 1, 1950, through July 31, 1954, is calculated at rates fixed and paid by the Postmaster General for “all other articles” of mail matter, and for the period August 1, 1954, through Decern- *28 ber 31, 1958, when a single rate was applicable to all categories of mails, at the same rate fixed and paid for other mails dispatched and transported on plaintiff’s vessels.
United Fruit has at all times maintained an active, live rate tariff for the carriage of a cargo commodity designated as “mailbags, canvas bags.” The Post Office Department has in the past dispatched hundreds of shipments of empty mail bags by ocean carriers under bills of lading as cargo under tariff rates; whenever it would be cheaper to do so.
33. No additional compensation was allowed for the trucking or cartage of mails from post offices to piers in the payments for the transportation of mails on a net weight basis after August 1, 1954, and the parties have stipulated the amounts due for such trucking at the cost to plaintiff per bag under the contracts between plaintiff and its trucking contractors at New York and New Orleans, plus 3 percent additional to cover administrative costs.
conclusion oe law
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that the plaintiff is entitled to recover and judgment will be entered to that effect. The amount of recovery will be determined pursuant to Rule 38 (c).

 “§ 1724. Except as otherwise provided by treaty or convention, the Postmaster General may require the transportation by any steamships of mail between the United States and any foreign port at the compensation fixed under authority of law. Upon refusal by the master or the commander of such steamship or vessel to accept the mail, when tendered by the Postmaster General or his representative, the collector or other officer of the port empowered to grant clearance, on notice of the refusal aforesaid, shall withhold clearance until the collector or other officer of the port is informed by the Postmaster General or his representative that the master or commander of the steamship or vessel has accepted the maU or that conveyance by his steamship or vessel is no longer required by the Postmaster General.”

 This means mall bags.